UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION


| UNITED STATES OF AMERICA, | ) | CASE NO: 1:18-CR-01107-MV |
|---|---|---|
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| WAYNE RYAN, | ) | Monday, April 30, 2018 |
| | ) | (10:31 a.m. to 10:41 a.m.) |
| Defendant. | ) | (10:50 a.m. to 11:15 a.m.) |


MOTION / DETENTION HEARING

BEFORE THE HONORABLE KAREN B. MOLZEN,
UNITED STATES MAGISTRATE JUDGE


(SEALED BENCH CONFERENCE OMITTED)



Appearances:                See Next Page

Court Reporter:             Recorded; Liberty - Rio Grande

Clerk:                      E. Romero

Transcribed by:             Exceptional Reporting Services, Inc.
                            P.O. Box 18668
                            Corpus Christi, TX 78480-8668
                            361 949-2988






Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES FOR:


Plaintiff:                GEORGE C. KRAEHE, ESQ.
                          U.S. Attorney's Office
                          District of New Mexico
                          P.O. Box 607
                          Albuquerque, NM 87103

Defendant:                ALEJANDRO B. FERNANDEZ, ESQ.
                          Office of the Federal Public Defender
                          First State Bank Building
                          111 Lomas Boulevard NW, Suite 501
                          Albuquerque, NM 87102

U.S. Probation/Pretrial: S. Koch

## INDEX

| DEFENSE WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHARLES PETERSON | 12 | 17 | | |

1    **Albuquerque, New Mexico; Monday, April 30, 2018; 10:31 a.m.**

2                          **(Call to Order)**

3          **THE COURT:**  This is a motion hearing in

4    18-CR-1107-MV, *United States of America versus Wayne Ryan*.

5    Counsel, if you'd enter your appearance.

6          **MR. KRAEHE:**  Good morning, Your Honor.  George Kraehe

7    for the United States.

8          **THE COURT:**  Thank you.

9          **MR. FERNANDEZ:**  Good morning, Your Honor.  Alejandro

10   Fernandez for Mr. Wayne Ryan, who is present, to my left.

11         **THE COURT:**  All right, Mr. Ryan.  Can you hear me all

12   right today?

13         **THE DEFENDANT:**  I can hear you just fine, ma'am,

14   thank you.

15         **THE COURT:**  Thank you.  We are here today on

16   defendant's opposed motion to temporarily modify conditions of

17   release.   I have reviewed both the motion and the response in

18   this matter.  Let's talk a bit more, Mr. Fernandez.

19         **MR. FERNANDEZ:**  Absolutely, Your Honor, and thank you

20   for the opportunity to further address the Court.  Mr. Ryan's

21   family and employer are here today.  That's who are in the --

22   well, the only people in the audience right now.

23         From your right to left is Mr. Peterson (phonetic),

24   who is his employer, and I'll go into that further in a moment.

25         **THE COURT:**  Okay.

1          **MR. FERNANDEZ:**  Then there is Ms. Mary Mabe

2   (phonetic), who is a good, close family friend, his mother, his

3   son, and his brother.

4          **THE COURT:**  Okay.  Thank you all for being here

5   today.

6          **MR. FERNANDEZ:**  Your Honor, I want to address the

7   Court primarily on the issue of employment because at the time

8   of his first hearing, it was said that he hadn't been employed

9   for at least seven years, and that's obviously a problem for

10  two reasons.

11         One, it appears as though Mr. Ryan gave false

12  information; and two, he is not employed, so that would no

13  doubt concern the Court for at least those two reasons.

14         **THE DEFENDANT:**  They thought I was lying is what

15  happened.

16         **MR. FERNANDEZ:**  Yes.

17         **THE DEFENDANT:**  I'm sorry.  But I wasn't.

18         **MR. FERNANDEZ:**  And Your Honor, so after that

19  hearing, I followed up with Mr. Peterson, who's now in court

20  today, and he's gotten me not just documents saying when and

21  how often Mr. Ryan has worked for him, but also confirmed that

22  he has a major project that Mr. Ryan was supposed to be on

23  presently.  And that major project is out in Arizona.

24         Mr. Peterson owns the company, Peterson Machine.  It

25  is machinery sales and engineering.  He's expressed to me how

1  important of an employee Mr. Ryan is.  He said he has

2  certifications and approvals that other employees just don't

3  have, certifications, and so he has skills that others don't

4  possess and also approvals, which means he can go onto certain

5  worksites that other employees can't because he's gone through

6  the necessary steps of showing that he is qualified to be

7  there.

8          **THE COURT:**  Is there some kind of a national security

9  clearance or -- what kind of certification are you talking

10  about?

11          **MR. FERNANDEZ:**  Well, Mister --

12          **THE DEFENDANT:**  Background checks are one.

13          **MR. FERNANDEZ:**  Mr. Peterson is here in court and he

14  expressed a willingness to testify, if Your Honor wants to ask

15  specific questions of him.  There's certain things I just, even

16  if he explains to me, I won't have the full grasp of, but it is

17  involved in the machinery and the work that he does, technical

18  certifications about what types of machines he can handle and I

19  understand --

20          **THE DEFENDANT:**  And going into -- I did a job last

21  year, at the Aerojet Rocketdyne plant in LA, California, for

22  Mr. Peterson and got in under those -- they have really

23  stringent, and strict qualifications to get into their plants

24  because of the type of work that they do for the Federal

25  Government.

1      **MR. FERNANDEZ**:  And that is what Mr. Peterson

2  explains to me, that it is -- the approvals are site-specific

3  and they do include background checks and drug testing, that

4  sort of thing.

5      And then -- so, that was one thing I thought was very

6  important for the Court to have some context of, but also

7  Mr. Peterson said that Mr. Ryan's work for him goes back over

8  20 years and that they have a relationship over 25.

9      At one point, Mr. Ryan was on the payroll and he was

10  a regular employee, but since '90, I'm sorry, since 1989, he's

11  been on a project basis and that's in part because Mr. Ryan

12  lives here in New Mexico and primary operations in

13  Mr. Peterson's line of work is in Arizona.

14      **THE COURT**:  So, he's been functioning as an

15  independent contractor?

16      **MR. FERNANDEZ**:  Essentially, yes.

17      **THE COURT**:  Okay.

18      **MR. FERNANDEZ**:  Yeah.  And, Mr. Peterson has been

19  very vocal in support, but also wishes to express to the Court

20  just how important Mr. Ryan is to his business and his current

21  project that Mr. Ryan was supposed to be on starting weeks ago

22  now.

23      **THE DEFENDANT**:  And I told -- Judge, if I may I say

24  something?  And I told some people that I was working for --

25      **MR. FERNANDEZ**:  No, no.  Huh-uh.

1          **THE DEFENDANT:**  No?

2          **MR. FERNANDEZ:**  So, sorry.  And I'm going to ask to

3     approach with respect to the second topic, Your Honor.

4          **THE COURT:**  All right.  Do you want to do that later?

5          **MR. FERNANDEZ:**  Yes.

6          **THE COURT:**  Okay.

7          **MR. FERNANDEZ:**  I do just want to add additionally

8     that some points that I wish to raise with respect to the

9     Pretrial Services Report specifically.

10         When it says that Mr. Ryan had traveled extensively

11    in South America, which I believe was, at least, something that

12    might concern the Court, I confirmed with Mr. Peterson that it

13    was a project for Peterson Machinery Sales that Mr. Ryan --

14         **THE DEFENDANT:**  I was there two weeks only.

15         **MR. FERNANDEZ:**  Yeah.  Mr. Ryan, they actually helped

16    coordinate getting him his passport and it was a project down

17    in Chile that he was working on and that was his travel in

18    South America.

19         **THE COURT:**  When was that and for how long?

20         **THE DEFENDANT:**  1996, Your Honor.  And I've only been

21    down there the one time and that was only to do that job for

22    Mr. Peterson.  I've never used my passport other than that, in

23    my life.

24         **THE COURT:**  Only for two weeks?

25         **THE DEFENDANT:**  It was two weeks long.

1      **MR. FERNANDEZ:** And that is, that's been confirmed

2  with Mr. Peterson. It was a concern for me that, Your Honor,

3  in the assessment of nonappearance, it says lack of verifiable

4  employment. Mr. Peterson had been made available to the

5  Pretrial Services Office. I know Anthony Galas (phonetic) had

6  spoken with him.

7      I understand he didn't get the paperwork that I have,

8  but there was some verification, so I think that part of the

9  report is incorrect.

10     Further, Your Honor, with respect to failures to

11 appear, I see only five arrests listed in the bail report and

12 none say that there was any failures to appear, so I'm not sure

13 if that was put as a matter of course or if there was some

14 information that I'm not privy to that has failures to appear.

15     **THE DEFENDANT:** There was a speeding ticket and I was

16 incarcerated.

17     **MR. FERNANDEZ:** Wait, wait, wait, wait. Okay.

18 That's, I guess where it came from, but I don't --

19     **THE COURT:** Well, I see the first -- the first one in

20 '93 --

21     **MR. FERNANDEZ:** Oh, I see, sorry.

22     **THE COURT:** -- was failure to appear.

23     **MR. FERNANDEZ:** The very first one. I apologize,

24 Your Honor, then. I would point out however that's nearly --

25     **THE COURT:** It's a long time ago.

1          **MR. FERNANDEZ:**  Yes, nearly 25 years, or just about

2     25 years.  By all other accounts, and that's why I thought it

3     was so important for the family to be here.  He has a strong

4     support network.  He is known to the community.  He is not

5     someone who, that Your Honor should be concerned with,

6     absconder status, but more importantly, Mr. Peterson, apart

7     from being an employer is pledging to the Court that he would

8     make sure that Mr. Ryan would be abiding by any of the

9     conditions placed by Your Honor including GPS monitoring and,

10    in a show of good faith, he actually has a place for Mr. Ryan

11    to stay on company property; it would be in the form of sort of

12    like a trailer, I believe.

13          **THE DEFENDANT:**  It's actually a building, it's a

14    house.

15          **THE COURT:**  And how long is this employment

16    anticipated to go for?

17          **MR. FERNANDEZ:**  I'm not sure how long --

18          **THE DEFENDANT:**  Well this job is about four months,

19    but he has several others that he wants me to do and I

20    personally was going to move out there and go to work for him

21    full-time.  Anyway, and my son was going to move out there with

22    me because I have joint custody of him also.

23          **MR. FERNANDEZ:**  And that was something that was

24    contemplated.  One of the conversations I had with Mr. Peterson

25    was obviously the nature of the offense.  Mr. Ryan would not

1   have -- would not be able to have any access to firearms.  And

2   he agreed that that's a company policy that no firearms are

3   allowed on the grounds anyway, and that he would also pay

4   special attention to that not being something that Mr. Ryan has

5   any access to.

6          Obviously, that would also mean if he's out on

7   company property in Arizona, he doesn't have any access to the

8   airplanes, the ultralights that were alleged in this case.

9          **THE COURT:**  Where are those ultralights now?

10         **MR. FERNANDEZ:**  I understand that they're still on

11  his property.  He has about 40 acres in New Mexico although --

12  yes, I believe they're still on the property.  I don't know if

13  the Government has taken any action to --

14         **THE DEFENDANT:**  Well, one of them has gotten damaged,

15  because there it wasn't secured.

16         **MR. FERNANDEZ:**  So, those I think cover the issues

17  that were not known or not present at the time of the original

18  bail hearing.  There's an additional thing I would like to

19  approach, because it's more sensitive.

20         **THE COURT:**  Okay.  Why don't you approach?

21  Mr. Kraehe.

22     **(Sealed bench conference omitted from 10:41 to 10:50 a.m.)**

23         **MR. FERNANDEZ:**  Your Honor, may I have a moment just

24  to step out and talk to Mr. Kraehe?

25         **THE COURT:**  Yes.

1          **THE DEFENDANT:**  If I may say something to you, Your

2    Honor?

3          **THE COURT:**  Why don't you wait until your attorney is

4    with you?

5          **THE DEFENDANT:**  Okay.

6          **MR. FERNANDEZ:**  And Your Honor, at this time, I'd ask

7    Mr. Peterson to take the stand.

8          **THE COURT:**  Very good.  Mr. Peterson, if you'd come

9    right over here.  That's the stand from which you'll testify.

10   And before you do that, I do need to place you under oath, and

11   if you'd raise your right hand, sir.

12               **CHARLES PETERSON, DEFENSE WITNESS, SWORN**

13         **THE COURT:**  Please be seated, sir.

14                          **DIRECT EXAMINATION**

15   **BY MR. FERNANDEZ:**

16   Q    Mr. Peterson, can you tell us your name?

17   A    Charles R. Peterson.

18   Q    And can you spell your last name for the record?

19   A    P-E-T-E-R-S-O-N.

20   Q    Can you tell us how you know Mr. Ryan?

21   A    I met Wayne Ryan originally in Casa Grande after he had

22   moved there in early '90s through church affiliation.

23   Q    And can you tell us what the nature of your business is?

24   A    We deal with rebuilding and restoration of industrial

25   machinery.

1    Q    And can you tell us how Mr. Ryan fits into your business?

2    A    Well, we realized early on that Wayne's ability was

3    exceptional in his mechanical aptitude, his perseverance, and

4    so on, and so the needs that we had he fit in very well with,

5    always has, and we employed him full-time for quite a number of

6    years in the '90s.

7              And since that period of time, we scaled back part of

8    our operation and so he did projects, intermittent projects, at

9    various locations around the country for us.  Those projects

10   involved going into plants and dismantling machinery, rigging,

11   loading and then occasionally he would be back at our facility

12   for the reassembly of the machines, rebuilding, retrofitting.

13   And he's also gone into plants like in Chile; actually

14   installed the machine and set it up for the customer.

15   Q    And can you tell us, the machines, what areas, what

16   sectors of industry do they service, or do you service?

17   A    We deal primarily with metal working industrial, most

18   manufacturing plants similar to the auto industry, the

19   aluminum, steel industry.

20   Q    And one of the things that was brought up was that there

21   are certifications and other approvals for certain worksites.

22   Can you tell us what that means?

23   A    Well, yes.  In most of the plants that we go into they

24   have certain programs of safety standards, as well as

25   qualifications for a person to operate forklifts, cranes,

1   equipment, and course, adhering to proper safety standards in

2   each of the plants, as well as undergoing evaluations of

3   testing for any abuse of any illegal drugs or alcohol.

4   Q    And can you describe for us what accommodations you might

5   have available for Mr. Ryan if he were to be released?

6   A    Well, we have a large industrial site, 25-acre site, in

7   Casa Grande, Arizona.  It's our main facility and we have a

8   caretaker's residence there that is vacant at the moment and

9   so, we had provisions for Wayne, before this occurred, to be

10  on-site, staying there, while working on the project we had,

11  the first project to start with.  He was going to be planned

12  putting on payroll as a permanent employee again.

13  Q    And forgive me for putting you on the spot, but Mr. Ryan

14  is, I think, sometimes very excited.  In your experience of 25

15  years with him, can you tell us how you've experienced his sort

16  of demeanor, and his -- the way he interacts with people?

17  A    Well, Wayne is pretty hyper and, in our line of work, his

18  ability to get in there and get the job done has always been

19  very valuable to us, but of course, because of that, you know,

20  he's had other initiatives and other opportunities and other

21  incentives to him.  He's gone elsewhere.  Otherwise, Wayne

22  would have been working for us permanently forever, but, you

23  know, he had other opportunities.

24          In fact, what occurred regularly was when he went

25  into other plants doing a job for us, those companies would

1  hire him, and that's where we would lose him usually, going to

2  work for other companies because they saw the value.

3         But of course, they didn't have the patience that we

4  had, so it didn't take long before they also realized that for

5  him to work with others, he works at such a rapid pace that

6  many others become offended and there's personality issues that

7  develop, and so -- I mean, we've overcome those in working with

8  Wayne.

9         We know Wayne.  The other individuals with our firm

10 are all well aware and are under the understanding that Wayne

11 coming back, that we look to this to be a permanent

12 relationship.

13         **MR. FERNANDEZ:**  Does Your Honor have any questions

14 that I didn't consider?

15         **THE COURT:**  Well, you mentioned that these projects

16 would take him to other facilities.  What you're going to have

17 him do now as an employee, is he going to be staying in Casa

18 Grande at all times?

19         **THE WITNESS:**  Well, we would in this case, depending

20 on the Court's decision.  The project we have right now is

21 right in Arizona.  It's in Phoenix, just a short distance from

22 us.  We're a suburb of Phoenix, and that's where he would be

23 working; that's the project for the next three months, maybe

24 longer.

25         We have projects planned in Texas and also in

1  Michigan and Ohio.  But, depending on the Court's latitude, you

2  know, we have others that can do those, but our preference is

3  of course for Wayne to do it, but we have more than enough to

4  handle.

5          There's been a major increase in industrial activity

6  in the country in the last number of months and so, we're

7  experiencing far more than we can handle, so right at our own

8  location, if that's what the Court prefers and pleases, that he

9  would stay right there.

10          **THE COURT:**  Okay, when you talked about

11  certifications, you're talking primarily about safety

12  certifications or certifications as far as abilities toward

13  certain industrial equipment?

14          **THE WITNESS:**  Yes, right.  Hydraulic, electrical,

15  mechanical.

16          **THE COURT:**  What about this notion of background

17  checks that might be required by the Government.  Has he ever

18  had any of those in connection with his work with you?

19          **THE WITNESS:**  We have not required it of him

20  ourselves, because we've known Wayne himself, but the companies

21  that have -- where we send him into, he has to go through

22  approval processes for them, as working for us, approved by

23  quite a number of firms, large, Fortune 500, Alcoa.  I had

24  quite a list.  Alcoa aluminum is one of them just recently.

25          **THE COURT:**  All right.  So, this place, the residence

1    where he would be located, how far is that from your residence?

2          THE WITNESS:  We're on the edge of Casa Grande; it's

3    about 10 miles from our industrial property.

4          THE COURT:  Okay.  So you would actually be living 10

5    miles away from where he would be?

6          THE WITNESS:  Yes, yes.  Now, I have two other

7    individuals with the firm that live within a half a mile to a

8    mile from our facility, management personnel.

9          THE COURT:  All right.

10         THE WITNESS:  Wayne has resided on our property in

11   the past.  So, he's very familiar with that.

12         THE COURT:  All right.  I don't have any other

13   questions.  Mr. Kraehe, do you have questions?

14         MR. KRAEHE:  I do have questions, Your Honor.

15         THE COURT:  All right.  And --

16         MR. FERNANDEZ:  May I sit down?

17         THE COURT:  Yeah.

18                        CROSS EXAMINATION

19   BY MR. KRAEHE:

20   Q    Sir, when was the last time you've worked with Mr. Ryan?

21   A    Wayne worked for us in a project in Los Angeles in July of

22   this last year.

23   Q    Okay.  And was he working for you as an independent

24   contractor or as an employee?

25   A    He was working as an independent contractor at that time.

1   Q    And for how long did he work for you during that period?

2   A    The project lasted about a month.

3   Q    Okay.  And over the last maybe five years, can you say how

4   many projects Mr. Ryan has worked for you on?

5   A    He's done at least six projects for us, outside of

6   Arizona.

7   Q    And the duration of those projects?

8   A    Usually they were anywhere from one week to three weeks.

9   Q    So over the last five years you've only worked with him on

10  a very intermittent basis, maybe a one-week project, a one-

11  month project in any given year?

12  A    Yes, that's correct.

13  Q    Okay.  So, you haven't had the opportunity to observe his

14  demeanor or his reliability, or his personal characteristics in

15  any respect other than during those work projects?

16  A    Yes, just during those projects.

17  Q    And during those projects, as an independent contractor,

18  he was out on his own, basically, without any of your

19  supervision; is that correct?

20  A    No, we had supervision in all those cases, relatively

21  close contact with him as well as other workers with him.

22  Q    Were you with him during those -- the entirety of those

23  projects?

24  A    I was with him the last one, as it began, in Los Angeles.

25  Q    Okay.  And do you have records that would substantiate

1   these projects?

2   A    Yes.

3   Q    Okay.  And have you done a background check recently on

4   Mr. Ryan?

5   A    No, we have not.

6   Q    When is the last time you did a background check?

7   A    Well, our background checks would've been really more

8   verbal and more consulting with others that he's been working

9   with or for, and so, it's probably been, maybe more than a year

10  or two since we've had any real evidence come back to us that

11  would give us confidence.

12  Q    Well, have you done, like, a criminal history check?

13  A    Well, I've known Wayne since early '90s, and have been

14  able to vouch very much for his character and know very well

15  many of the different incidents he's been involved in.

16  Q    Okay.  And you mentioned earlier that Mr. Ryan operates

17  heavy machinery as part of his employment with you?

18  A    Yes.  Cranes, forklifts and so on.

19  Q    Okay.  And certainly, it would be irresponsible of you to

20  employ someone who operates that kind of machinery if that

21  person was a regular drug user?

22  A    Right.  We've never had anybody that has his ability in

23  operating, and we are -- we know in more recent years that

24  there's been no activity as far as drugs are concerned.

25  Q    You're sure of that?

 1   A    Yes.

 2   Q    Okay.  Would it surprise you that drugs were found in

 3   Mr. Ryan's vehicle when he was arrested just over a month ago?

 4   A    Well, we know that he's been on medication because of his

 5   hyperness from a young age.  I forget what they call it

 6   exactly, but, that was more in line with his metabolism than

 7   anything else.

 8   Q    Okay.  It wouldn't be in line with his use of

 9   methamphetamine, which was the drug that was found in his

10   vehicle at the time of his arrest?

11   A    No.  We've never known him to be out of control or in any

12   way under influence.

13   Q    Okay.  Would that concern you though, if an employee was

14   found to have drugs in his vehicle?  Methamphetamine?

15   A    Yes, it would if he was involved with it or using it, yes.

16   Q    Okay.  And, if there were information to the effect that

17   Mr. Ryan was a drug user, a known drug user on a regular basis,

18   and I'm talking about methamphetamine and other illegal drugs,

19   would that be of concern to you as an employer?

20   A    Yes, it is, it always has been.

21   Q    Okay.  And you wouldn't employ someone who was a regular

22   user of methamphetamine or other illegal drugs?

23   A    Yes, that's correct.

24           **THE COURT:**  Excuse me.  You've had, Mr. Peterson,

25   employed or in a contract basis frequently.  Have you ever

1    undertaken drug testing while he was working with you?

2            **THE WITNESS:**  Yes, he did undergo testing at almost,

3    must have been 12 years ago, in the late '90s, when he was

4    working for us at that time.

5            **THE COURT:**  But not in the last five years?

6            **THE WITNESS:**  No.

7            **THE COURT:**  Okay.  Thank you.

8    **BY MR. KRAEHE:**

9    Q    Just to be clear, the late '90s was about 20 years ago,

10   right?

11   A    Yeah, that's right, when he was on full-time payroll up

12   until '99.  Yeah.

13   Q    Okay.  And that's the last time you did a drug check on

14   Mr. Ryan?

15   A    Yes.

16   Q    Okay.  And the certifications that Mr. Ryan requires, do

17   these also require some kind of background check?

18   A    Yes, most of them; not required by us because we've known

19   him, but by the companies that we're doing business with for

20   him to be on their premises.  They're the ones that require

21   that.

22   Q    Okay.  Do you know whether these businesses would allow

23   Mr. Ryan to be on their premises if they knew that he was a

24   regular user of illegal drugs?

25   A    They would not allow it on their property?

1   Q    Okay.  Do you know whether Mr. Ryan's certifications are

2   current?

3   A    Well, we know that the one from Alcoa, and of course, he

4   mentioned Rocketdyne -- Aerojet Rocketdyne in Los Angeles was.

5   Q    Okay.

6   A    That was last year.

7   Q    All right.  And what other certifications -- well, what

8   certifications would Mr. Ryan require for the job that you have

9   in line for him?

10  A    Well, the project at Alcoa coming up, he already has that

11  because he's been approved for them before.

12  Q    Okay.  And you have -- do you have any concerns at all

13  about Mr. Ryan and his past history of drug use?

14  A    No, I don't; we do believe more recently that his -- based

15  on his affirmations to us, which are significantly different

16  before this occurred even, that we were -- had scheduled him to

17  come on as a permanent payroll employee living on our property.

18  Q    Okay.  And the fact that methamphetamine was found in

19  Mr. Ryan's vehicle just a month ago, that's of no concern to

20  you at all?

21  A    Well, he's explained it to us, and so we trust his

22  explanation of it.

23  Q    And his explanation of that was what?

24  A    Well, it was -- apparently involving some activity that

25  was going on that he was assisting federal agencies and so,

1  that's my understanding of it.

2          **MR. KRAEHE:**  I have no further questions, Your Honor.

3          **THE COURT:**  Also Mr. Peterson, you indicated that you

4  had contacted his employers and -- who all had he worked for in

5  the past?

6          **THE WITNESS:**  Well, the companies that we were doing

7  business with that had hired him.  One was a company in North

8  Carolina -- or no, Virginia, that hired him in the midst of the

9  project.  After we had shipped the machine to them, they wanted

10 him to come in, and then they hired him after that.

11         **THE COURT:**  How long ago was that?

12         **THE WITNESS:**  Wayne would probably know more exactly

13 the year, but that would have been probably just near 2003, I

14 think, 2004.

15         **THE COURT:**  Okay.  What about in the last five years?

16 Do you have any idea who he's been working for in those last

17 five years other than projects with you?

18         **THE WITNESS:**  Well we know about it, his employer in

19 Socorro, the automotive repair facility there.  We know of them

20 and what he was doing there.  Because he's always done that

21 type of work also.

22         **THE COURT:**  All right.  You also talked to my

23 Pretrial Services Officer, Anthony Galas?

24         **THE WITNESS:**  Yes, that's correct.

25         **THE COURT:**  Okay.  And during the initial interview

1   with him, you seemed to indicate that there was no employment

2   relationship, or something to that effect.

3           **THE WITNESS:**  Well --

4           **THE COURT:**  Can you tell me why?

5           **THE WITNESS:**  Actually, that -- we received a phone

6   call, unidentified phone call which would have been a month or

7   so ago.  We received an unidentified phone call to us.

8           I didn't actually take the call initially, but the

9   call came to us about, was Wayne Ryan employed by us?

10          Well, we don't answer those kind of questions

11  verbally, you know.  Our labor policy is that it needs to be in

12  writing; we need to know who's asking.

13          There was no identification as to who was asking it

14  and the best I can tell is whoever did respond on it was not

15  aware of where we were with Wayne at that very moment of

16  bringing him back onto the payroll, knowing that he had worked

17  for us back last summer on a project.  And so --

18          **THE COURT:**  Okay, so you didn't have any discussions

19  at all with Mr. Galas?

20          **THE WITNESS:**  Well, I spoke to this Mr. Galas by

21  referral from Alejandro Fernandez to clarify about Wayne's

22  employment, Wayne Ryan's employment.

23          **THE COURT:**  But not the initial phone call?

24          **THE WITNESS:**  No, no.

25          **THE COURT:**  All right.  Those are the questions I

1  have.  Do you have any others Mr. Kraehe?

2        **MR. KRAEHE:**  No, Your Honor.

3        **THE COURT:**  How about you, Mr. Fernandez?

4        **MR. FERNANDEZ:**  Nothing further, Your Honor.

5        **THE COURT:**  All right.  Thank you, Mr. Peterson.  I

6  appreciate it.

7      **(Witness excused)**

8        **THE COURT:**  I noticed -- I'm looking at the Pretrial

9  Services Report and there is no indication of any employer

10 there in Socorro.

11       **MR. FERNANDEZ:**  Are you talking about the auto --

12       **THE COURT:**  Yes, sir.

13       **THE DEFENDANT:**  Leesburg Auto?

14     **(Defendant confers with attorney)**

15       **THE DEFENDANT:**  I resigned, to go to work for him.

16       **MR. FERNANDEZ:**  How long did you work there?

17       **THE DEFENDANT:**  I worked for him for like last seven

18 days, months, since September of last year, I worked for

19 Leesburg Auto and I was doing some work for another friend of

20 mine with a drill rig that I had on my Jeep.

21       We were core drilling for mineral samples and I was

22 doing that for the last year and a half, between working for

23 Charlie.

24       **MR. FERNANDEZ:**  So, I guess, Your Honor, the short of

25 it is, I don't know whether they asked him about those things

1  in particular.  Clearly, Peterson Machinery has been his most

2  consistent and long-lasting employment and the one that he

3  thought he was lining up for.  He was expecting to do this --

4  this project in Arizona.

5        **THE COURT:**  I guess it gives me some concerns because

6  it's been from -- the way I understood Mr. Peterson's testimony

7  is it's been intermittent times that he's been working with

8  Mr. Peterson.  Only now would it be an employment relationship

9  as opposed to a contractor relationship.

10        I think he said in the past it was primarily a couple

11  of weeks, a week to a month, and now, it's a three-month

12  project he's proposing.

13        I still have some concerns and I don't mean to

14  interrupt you here, but, Mr. Kraehe, you made reference to

15  methamphetamine that was found in the car.  I don't -- or in

16  his vehicle -- is that right?

17        **MR. KRAEHE:**  Yes, Your Honor.

18        **THE COURT:**  I don't -- is that in your motion?  I

19  mean, what's the source of that information?

20        **MR. KRAEHE:**  Your Honor, I do believe there was some

21  testimony to that effect at the hearing.

22        **THE COURT:**  I'm trying to remember back.  I've been

23  through a few hearings.

24        **MR. KRAEHE:**  I couldn't say for sure, Your Honor.  I

25  know it is on the Pretrial Services Report and it's definitely

1    something that was found, Your Honor.

2         **MR. FERNANDEZ:**  And Your Honor, I trust the

3    Government to the extent that if they're saying it was found

4    and they believe it's vouchered.  If for some reason that's

5    incorrect, that'll come to light, but if they're representing

6    that was there, I'm willing to assume that is the truth for

7    right now.

8         That's precisely the sort of thing that conditions

9    can be reached to address.  If he's in Arizona, that's just a

10   suburb of Phoenix.  There's certainly robust Pretrial Services

11   Agency there that could both monitor his physical location,

12   whether it be GPS or other checking in, and have random and

13   very frequent, even daily drug testing.

14        What Mister -- well, Mr. Ryan's clearly been without

15   any substances, whether prescribed or otherwise, for the

16   duration of his incarceration.

17        It's not something that he wants to jeopardize his

18   future with.

19        **THE DEFENDANT:**  I'll do anything you want to prove to

20   you that I'm -- I'm not that type of person that they're

21   portraying me in this --

22        **THE COURT:**  And as I indicated to Mr. Fernandez, I

23   still have some other concerns.  And I think I'm going to

24   require testimony by someone who can verify or at least explain

25   to me some statements that you've made in the past.

1          I also need to understand why anyone would have a

2   handcuff key in their mouth at the time that this happened.

3          **MR. FERNANDEZ:**  And that will be part of --

4          **THE COURT:**  You know, when I'm looking at flight

5   risk, that is probably one of the most significant indicia of a

6   flight risk.

7          **THE DEFENDANT:**  I can explain that.

8          **MR. FERNANDEZ:**  No.  I think the additional testimony

9   that Your Honor might want to hear could go some ways towards

10  addressing that.

11         **THE COURT:**  Because at this point, Mr. Ryan, I need

12  more testimony that would convince me that you're not a risk of

13  flight -- that --

14         **THE DEFENDANT:**  What about -- what about my personal

15  testimony to you?

16         **THE COURT:**  Well, I'm going to let you talk to your

17  attorney before you give any testimony.  That's why I appointed

18  him.  Of course, it's always your right to decide what you want

19  to do, but I want you to have full advice from your attorney.

20         There's some questions I have.  I think he'll go

21  through those with you to try and explain my concerns because

22  these are significant charges and I need to make sure that

23  there's -- that any conditions that I fashion will assure the

24  safety of the community, and we do have that discussion about

25  methamphetamines in your vehicle.

1        Also, flight risk.  And I have some indicia with

2   that.  So, let's -- I'm going to ask Mr. Fernandez, if you want

3   to proceed, to get in touch with my courtroom deputy to find a

4   time when I can hear from that additional witness.

5        **MR. FERNANDEZ:**  Your Honor, would that be in the

6   nature of a continued hearing or would you want me to file a

7   new motion?

8        **THE COURT:**  No, I think it could be a continued

9   hearing.

10        **MR. FERNANDEZ:**  Okay.

11        **THE COURT:**  Yeah.  You don't need anything more, do

12   you, Mr. Kraehe?

13        **MR. KRAEHE:**  No, Your Honor.  I did want to make the

14   point that, you know, it seems like Mr. Peterson, who seems

15   like a very nice guy, has taken Mr. Ryan sight unseen and on

16   his word, and I'm wondering whether Mr. Ryan is in fact

17   employable in the capacity that Mr. Peterson says he is if

18   Mr. Ryan does do what, I think any employer's due diligence

19   would be and --

20        **THE COURT:**  Right --

21        **MR. KRAEHE:**  -- and check into Mr. Ryan's background

22   because I can't imagine an employer in their right mind would

23   hire someone like Mr. Ryan given his background.

24        **THE COURT:**  Well, he's got a lot of talents, I'm

25   sure; that's what Mr. Peterson was talking about.  The talent

1  alone is one aspect.  The other part is if there are risks that

2  I perceive and he may as well.

3          So, let's go on ahead and have that other hearing,

4  because right now, I don't feel sufficiently comfortable where

5  I would set conditions.

6          **MR. KRAEHE:**  Okay.

7          **THE COURT:**  But, let's hear what else you have.  All

8  right.  Thank you.  Thank you, Mr. Fernandez.

9          **MR. FERNANDEZ:**  May I be excused, Your Honor?

10         **THE COURT:**  You may.  Have a good day.

11      **(Proceeding was adjourned at 11:15 a.m.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the

electronic sound recording of the proceedings in the above-

entitled matter.




_____          June 14, 2018_


TONI HUDSON, TRANSCRIBER