UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 18-MJ-0863-KBM |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| | ) | Tuesday, March 20, 2018 |
| WAYNE RYAN, | ) | |
| | ) | (10:32 a.m. to 11:11 a.m.) |
| Defendant. | ) | (11:15 a.m. to 11:29 a.m.) |

PRELIMINARY EXAMINATION / DETENTION HEARING

BEFORE THE HONORABLE KAREN B. MOLZEN,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:            GEORGE KRAEHE, ESQ.
                         U.S. Attorney's Office
                         District of New Mexico
                         P.O. Box 607
                         Albuquerque, NM 87103

For Defendant:           ALEJANDRO B. FERNANDEZ, ESQ.
                         Federal Public Defender's Office
                         111 Lomas Blvd. NW, Suite 501
                         Albuquerque, NM 87102

U.S. Pretrial/Probation: S. Avila-Toledo

Court Reporter:          Recorded; Rio Grande

Clerk:                   E. Romero

Transcribed By:          Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, TX 78480-8668
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

                         <u>INDEX</u>

<u>GOVERNMENT'S WITNESS</u>       <u>DIRECT</u>          <u>CROSS</u>

PETER UBBELOHDE              4                 10


<u>ARGUMENT</u>

BY MR. FERNANDEZ        29/36/40

BY MR. KRAEHE          33/38/41


<u>RULINGS</u>

RE PROBABLE CAUSE       34

RE DETENTION            43

1    **Albuquerque, New Mexico; Tuesday, March 20, 2018; 10:32 a.m.**

2                        **(Call to Order)**

3            **THE COURT:**  United States of America versus Wayne

4    Ryan; 18-MJ-863, for preliminary hearing.

5            **MR. KRAEHE:**  Good morning, your Honor.  George Kraehe

6    for the United States.

7            **THE COURT:**  Thank you.

8            **MR. FERNANDEZ:**  Good morning, your Honor.  Alejandro

9    Fernandez for Mr. Ryan.

10           **THE COURT:**  All right.  Mr. Ryan, can you hear

11   everything today?

12           **THE DEFENDANT:**  Yes, ma'am.

13           **THE COURT:**  All right.  Why don't you have a seat at

14   defense table?

15           And, Government, call your first witness.

16           **MR. KRAEHE:**   Present, Your Honor, the United States

17   calls Special Agent Peter Ubbelohde.

18           **THE COURT:**  All right.  If you'll come up to the

19   witness stand, and if you'd raise your right hand, I'm going to

20   place you under oath.

21           **PETER UBBELOHDE, GOVERNMENT'S WITNESS, SWORN**

22           **THE COURT:**  Please be seated.

23   //

24   //

25   //

**DIRECT EXAMINATION**

1

2    **BY MR. KRAEHE:**

3    Q    Sir, would you please state your full name?

4    A    Peter Jon Nystrom Ubbelohde.

5              **THE COURT:**  Oh, boy.  You're going to have to spell

6    that one.

7              **THE WITNESS:**  U-b-b-e-l-o-h-d-e.

8    **BY MR. KRAEHE:**

9    Q    And you are currently employed where?

10   A    The FBI.

11   Q    And what do you do at the FBI?

12   A    Special agent.

13   Q    Were you involved in an investigation involving a person

14   by the name of Wayne Ryan?

15   A    I was.

16   Q    And do you recognize Wayne Ryan here in the courtroom

17   today?

18   A    I do.

19   Q    Could you point him out, please?

20   A    The defendant in red.

21             **MR. KRAEHE:**  Your Honor, would the record reflect

22   that he has identified the Defendant?

23             **THE COURT:**  It will so reflect.

24   //

25   //

1   **BY MR. KRAEHE:**

2   Q    And can you tell me what the investigation involves

3   briefly; what the criminal activity that you -- was that you

4   were investigating?

5   A    Mr. Ryan was brought to our attention when we asked -- the

6   FBI asked New Mexico Game and Fish if they were aware of anyone

7   who may harbor any violent or extremist ideologies towards the

8   United States Government.

9         The investigation took on the nature of the firearms

10  violations to include converting weapons to fully automatic and

11  the use of silencers on weapons.

12  Q    And what information did you obtain in the course of this

13  investigation relating to the possession by Mr. Ryan of

14  automatic weapons and silencers?

15  A    On one occasion, this past January, a confidential source

16  had wore audio and video recording device in which Mr. Ryan's

17  source -- Mr. Ryan showed the source how to convert a weapon to

18  fully automatic, as well as fire the weapon with a silencer and

19  an automatic function.

20        **MR. FERNANDEZ:**  Your Honor, I apologize, but there's

21  a number of confidential informants listed in the complaint.

22  Can we number them?

23        **THE COURT:**  That's -- that's probably a good idea.

24        Let me interrupt for one minute.  Mr. Knoblauch

25  (phonetic), I don't have you down for anything.

1        **MR. KNOBLAUCH:**  No, you don't.  I'm here as an

2    observer right now.

3        **THE COURT:**  That's fine.  I just -- I just wanted to

4    make sure there wasn't a misunderstanding, okay?

5        **MR. KNOBLAUCH:**  Oh, no.  Thank you.

6        **THE COURT:**  All right, thank you.

7        Go on ahead.

8    **BY MR. KRAEHE:**

9    Q    So what -- what confidential source was that that you were

10   referring to?

11   A    Confidential Source Number 2 as listed in the affidavit.

12   Q    And was there a video tape,  an audio recording made of

13   the encounter between this confidential source and the

14   Defendant?

15   A    There was.

16   Q    And could you see what was going on and hear what was

17   going on by looking at this  videotape?

18   A    You could.

19   Q    Okay, and can you just tell the Court, briefly, what you

20   could see and hear -- summarize for the Court what you could

21   see and hear from this  videotape?

22   A    Yes.  The source and Mr. Ryan drove in his vehicle out to

23   a wilderness area where Mr. Ryan demonstrated how to

24   manufacture a piece that would make the weapon function

25   automatically.

1          The piece -- I don't know if you could see it being

2  inserted in the video, but they discussed it.  It was inserted

3  into the weapon, and they fired the weapon in automatic mode.

4          Mr. Ryan also discussed how he uses automobile oil

5  filters that thread onto the end of the muzzle, which were

6  observable in the video, and reduces the noise of the gunshots.

7  Q    And could you -- and this was like a silencer device?

8  A    It was a silencer device.

9  Q    Could you see that in the video?

10 A    You could.

11 Q    Was it handmade?

12 A    It -- like I said, it was an oil filter -- Mr. Ryan

13 discussed how he adapts the threading on the oil filter to fit

14 onto the muzzle of the rifle and how the first round that is

15 fired through the oil filter makes the hole in the end of the

16 filter.

17         And some of them, he uses steel wool to -- in the

18 construction inside the oil filter.

19 Q    And did Mr. Ryan actually fire this automatic weapon on

20 the video?

21 A    I could not see -- I did not watch the video in its

22 entirety.  I saw the source  firing and the weapon and I could

23 hear the weapon being fired, but due to the angle of the

24 camera, I could not see who was firing it.

25 Q    Okay.  Did it appear to be firing in an automatic mode?

1  A     It did.

2  Q     Okay.  And did it sound that way?

3  A     It did.  Both Mr. Ryan and the source commented on it

4  firing in an automatic way as well.

5  Q     And did you -- did Mr. Ryan also use a silencer on this

6  video?

7  A     Yes, he did.

8  Q     And what was the effect of the silencer on -- on the noise

9  level?

10  A     It sounded quieter.  And again, both the source and

11  Mr. Ryan commented on how much it reduced the sound of the

12  gunshot.

13  Q     And that was all on the video?

14  A     It was.

15  Q     And was a search later conducted of Mr. Ryan's residence?

16  A     Yes.

17  Q     And did you find any of these weapons or silencer devices

18  or converter devices during the course of this search?

19  A     A search was conducted at three different locations:  His

20  residence near Riley, New Mexico; an RV he maintains in

21  Socorro, New Mexico; and the vehicle he had with him the day of

22  the arrest.

23         At all three locations, oil filters were found that

24  were used as silencers.

25  Q     And the weapon that was used in this video, do you know

1   whether that was found?

2   A    It was -- a weapon that matches the appearance of the

3   weapon in the video was found in his vehicle.

4   Q    Okay, and how about the converter device that was used to

5   convert the weapon to an automatic weapon?

6   A    That -- that piece was found on Mr. Ryan's person.

7   Q    Do you know whether anyone conducted any check of a

8   National Firearms Registry to determine whether or not Mr. Ryan

9   had registered or obtained permission of any kind or authority

10  of any kind to possess the machine gun or the silencers?

11  A    I do not know.

12  Q    Do you know whether there were any serial numbers on the

13  silencers?

14  A    No.

15  Q    Okay, there weren't?

16  A    There were not.  They were all -- there were oil-filter

17  silencers and there were other components that appeared to be

18  homemade silencers in his RV.

19  Q    And of the places that you searched, do you know whether

20  anyone other than Mr. Ryan resided at those locations?

21  A    No.  No, I -- my understanding is no one else resided at

22  those locations.

23          **MR. KRAEHE:**  Your Honor, I believe those are all the

24  questions I have.

25          **THE COURT:**  All right.  Mr. Fernandez?

**CROSS EXAMINATION**

1

**BY MR. FERNANDEZ:**

2

Q    Good morning.

3

A    Good morning.

4

Q    You found the weapon that you said matched what was on the

5

video in  his car -- in Mr. Ryan's car?

6

A    Yes.

7

Q    And that did not have a piece that made it fully

8

automatic, did it?

9

A    Attached to the weapon at the time -- there was not a

10

piece inside the weapon at the time, correct.

11

Q    The weapon that you seized was not fully automatic?

12

A    Correct.

13

Q    And you said you found a number of oil-filter silencers?

14

A    I'd like to clarify.  None of the weapons that we found

15

have yet been tested for functionality.

16

Q    And as of now, they still have not been tested?

17

A    Correct.

18

Q    So you don't know if any of the weapons can even fire?

19

A    Correct.

20

Q    Okay, and I just want to clarify something.  You're not

21

the person -- you're not the officer who wrote the affidavit in

22

this case, are you?

23

A    That is correct, I'm not.

24

Q    But you're fully aware with that -- of that affidavit?

25

1  A    I am.

2  Q    And is there anything in that affidavit that you would

3  change or alter based on information that you personally know?

4  A    No.

5  Q    Is there anything that you deem to be incorrect?

6  A    No.

7  Q    You said you found a number of things that you

8  characterize as a silencer?

9  A    Yes.

10  Q    And they are made from oil filters?

11  A    There were a number of oil filters that appeared to have

12  gunshot wounds -- or a gunshot bullet through them.

13        There were also other -- a flashlight, what I -- much

14  akin to a Maglite flashlight tube that had a series of metal

15  baffles with bullet holes through them, as well as another case

16  which contained baffles that had a pre-drilled hole through

17  them, which is congruent to homemade silencers.

18  Q    So I don't -- I'm not familiar with guns.  What's a

19  "baffle"?

20  A    A metal disk.

21  Q    Okay, and the holes -- you didn't observe the holes be --

22  be put into those items, right?

23  A    I did not.

24  Q    A gun can be shot from anywhere to make those holes?

25  A    I presume, yes.

1    Q    So you -- other than this video -- and we'll talk about

2    that in a moment -- you didn't see any of these things get made

3    or used?

4    A    None of the silencers.  The video does capture Mr. Ryan

5    fabricating the piece that he says gets inserted to make the

6    weapon automatically.

7    Q    Okay, but none of the silencers?

8    A    Correct.

9         **THE COURT:**  Could you repeat that for me?  What does

10   the video show?

11        **THE WITNESS:**  The video shows Mr. Ryan sitting in the

12   front seat of his car making the metal piece that he inserts

13   into the rifle to function automatically.

14        **THE COURT:**  Okay, thank you.

15   **BY MR. FERNANDEZ:**

16   Q    Now, you said you searched three different locations that

17   you believe to be owned or at least used by Mr. Ryan?

18   A    Yes.

19   Q    And in any of those locations, did you find a meth lab?

20   A    We did not.

21   Q    In any of those locations, did you find explosives?

22        **MR. KRAEHE:**  Your Honor, I'm going to object as

23   irrelevant.

24        **MR. FERNANDEZ:**  Your Honor, this goes to the veracity

25   and the reliability of any of the -- any of the informants in

1   this case.

2           They all allege pretty outrageous things, including

3   explosives, meth labs, large quantities of drugs, what sounds

4   like drone -- drones that can be used to fly at low levels.

5           If those are all things that were not found in an

6   extensive search, that undermines the accusations of a variety

7   of these -- of these witnesses that were relied upon to conduct

8   the investigation.

9           **THE COURT:**  I'm going to overrule the objection.

10          You can continue.

11          **MR. FERNANDEZ:**  Thank you, your Honor.

12  **BY MR. FERNANDEZ:**

13  Q    So I believe the last question you responded to is, no

14  meth lab was discovered.  Were there explosives found?

15  A    There were hobby or cannon fuse found.  There was --

16          **THE COURT:**  No.  A what?

17          **THE WITNESS:**  A fuse.

18          **THE COURT:**  You said "hobby"?

19          **THE WITNESS:**  "Hobby fuse" is the common term or

20  "cannon fuse."

21          **THE COURT:**  Okay.

22          **THE WITNESS:**  There were commercial fireworks that

23  were found.  There were military grade pyrotechnics that were

24  in his premise, as well as potassium permanganate, which could

25  possibly be used as a precursor to explosives.

1          **THE COURT:**  And potassium what?

2          **THE WITNESS:**  Permanganate.

3          **THE COURT:**  Permanganate, okay.

4          **THE WITNESS:**  However that --

5    **BY MR. FERNANDEZ:**

6    Q    You didn't find Tannerite?

7    A    We did not find Tannerite; we found smokeless powder that

8    was used -- a layman would use it reload a firearm -- make

9    bullets.

10   Q    So those things would be consistent with having legal

11   guns?

12   A    The smokeless powder is, yes.

13   Q    Did you find a plane that could be flown at just above or

14   below electric wires or telephone wires?

15   A    On his property in Riley, New Mexico, or near Riley

16   Mexico, there were two aircraft on the property.

17   Q    Okay, and those were normal airplanes?

18   A    I -- one seems normal, very small, and another was, what I

19   would call as a layman, an ultralight aircraft.

20   Q    Did you notice that any of them had body armor wrapped

21   around the gas tank?

22   A    I did not observe that.

23   Q    Now, you started this investigation looking for extremists

24   or people with extremist ideology; is that correct?

25   A    Correct.

1    Q    You didn't find that, presumably?

2    A    Local law enforcements told us that Mr. Ryan had made

3    statements that were close to sovereign ideologies, but nothing

4    that crossed the line as extreme or of extreme sovereign.

5    Q    Well, you characterized the investigation as switching at

6    some point from -- away from the original goal to investigating

7    firearms.

8         That's your testimony, I believe?

9    A    The investigate -- we are -- we have charged -- or

10   arrested Mr. Ryan on firearms violations.

11   Q    Do you still suspect him of extremist ideology?

12   A    We have nothing that indicates that at this time.

13   Q    Now, were you investigating all of New Mexico when you

14   approached Socorro Game and Wildlife or were you specifically

15   interested in what was going on in Socorro?

16        **MR. KRAEHE:**  Objection, your Honor; irrelevant.

17        **THE COURT:**  What would be the relevance?

18        **MR. FERNANDEZ:**  I think it goes to the -- the

19   motivation officers have in making a case against Mr. Ryan,

20   whether he's a social outcast, a pariah  or he was actually

21   someone on their radar that they were intending to arrest and

22   build a case against.

23        If there were --

24        **THE COURT:**  No.  Objection sustained.

25   //

1   **BY MR. FERNANDEZ:**

2   Q    You approached him; he didn't come to you; is that right?

3   A    That is correct.

4   Q    Now, you mentioned Confidential Source Two.  There was a

5   prior confidential source; is that right, that you called

6   "One"?

7   A    Yes.

8   Q    And that person you met over a year ago -- or at least

9   your team met over a year ago?

10  A    Yes.

11  Q    Now, without saying what relation -- what -- who he is or

12  who she is, can you characterize the relationship that person

13  has with Mr. Ryan?

14  A    I am not familiar with that.  No, I cannot.

15  Q    That person suspected Mr. Ryan of selling drugs?

16  A    Yes.

17  Q    But you didn't find any indication of that; is that right?

18  A    I cannot speak to the drugs that were found in his -- in

19  his vehicle, whether they were -- I know drugs were recovered

20  in his vehicle.  Whether they were packaged for distribution or

21  that -- I do not know.

22  Q    The Confidential Source One said that Mr. Ryan claimed he

23  was dropping flower bombs on military personnel; is that right?

24  A    That's what I -- that's what Source One said, yes.

25  Q    And that was a claim that was investigated, right?

1    A    I do not know.

2    Q    According to the affiant, in effort to substantiate the

3    flower bomb claim, there were entries of military personnel,

4    summaries of which are provided.

5         Is that something that you're aware of?

6    A    I am not.

7    Q    So as far as you know, that claim that he was dropping

8    fire -- flower bombs was never corroborated?

9    A    I --

10        **MR. KRAEHE:**  Let me interrupt, your Honor.  Calls

11   for speculation.

12        **THE COURT:**  If you know.

13        **THE WITNESS:**  I do not know if it was or it was not.

14   **BY MR. FERNANDEZ:**

15   Q    If a civilian was dropping flower bombs on military

16   personnel, that would be a big deal, right?

17   A    Yes, it would.

18   Q    Okay, and that's something that likely would be

19   investigated as part of an ongoing investigation into somebody?

20   A    Correct.

21   Q    There is a BLM Ranger named Mark Wheeler that you

22   investigated -- you spoke to as part of this investigation?

23   A    Yes.

24   Q    And Ranger Mark Wheeler says that he was actually

25   previously investigated -- Mr. Ryan?

1    A    Yes.

2    Q    The ranger never arrested Mr. Ryan, though, right?

3    A    Correct.

4    Q    The information that BLM Ranger Mark Wheeler corroborated

5    was that he saw Mr. Ryan digging holes?

6    A    Yes.  I -- I don't know if he had -- I don't know what

7    Wheeler observed, but that was what he claimed.

8    Q    He also claimed that he -- that Mr. Ryan maintained a meth

9    lab that he had covered in black plastic; is that right?

10   A    Yes.

11   Q    You didn't observe that?

12   A    We found an RV on the property.  It was not covered in

13   black plastic at the time we conducted the search.

14   Q    And nor did it appear to be a meth lab?

15   A    We did not find any -- no, it did not seem like it was a

16   functioning meth lab.  No.

17   Q    There was a -- I don't know what number now -- fifth or

18   fourth person who is a New Mexico law enforcement officer who

19   wanted to remain anonymous in this investigation?

20   A    Yes.

21   Q    And that person maintained a text communication with one

22   of the officers on your team?

23   A    Yes.

24   Q    That New Mexico law enforcement agent never arrested

25   Mr. Ryan; is that correct?

1   A      Not to my knowledge.

2   Q      The -- he says that he actually accompanied Mr. Ryan in

3   shooting the gun at one point in automatic mode?

4   A      I would have to refer to the affidavit.

5          I believe that officer claimed that he had observed

6   Mr. Ryan make the device that makes a weapon go automatic.  I'd

7   have to look at --

8   Q      Well, let me see if I can add some more detail to it, and

9   perhaps you'll remember.

10         He said that he was in a parking lot of a Leseberg Auto in

11  Socorro and that they fired the gun together?

12             **THE COURT:**  Which page are you on on the --

13             **MR. FERNANDEZ:**  Page 6.

14             **THE COURT:**  Okay, thank you.

15  **BY MR. FERNANDEZ:**

16  Q      It says:

17             "He stated that the device enables an AR-15 to work

18             very well in automatic mode.  Ryan explained and

19             demonstrated this to Officer One in the parking lot

20             of Leseberg Auto in Socorro, New Mexico."

21             Do you recall that incident?

22  A      I don't recall that night -- well, I recall --

23  Q      Do you recall --

24  A      -- that in the affidavit --

25  Q      -- that being him?

1   A    I did not understand that to mean that they discharged a

2   firearm versus demonstrate the functionality of the automatic

3   conversion.

4   Q    How would one demonstrate the functionality of an

5   automatic weapon without firing it?

6   A    I'm not a firearms expert.  The weapon that he would use

7   was a AR-type weapon, which has a series of sears that are

8   released when the trigger is pulled that allows the hammer to

9   strike the firing pin and get retained or captured after only

10  one round.

11          My understanding is this device allows that hammer

12  to  move freely.  So you could simulate the function of the

13  firearm without discharging it.

14  Q    Okay, and so you can fully explain how a gun can be shot

15  in automatic mode without firing it, presumably.

16          The officer in this case didn't think that Mr. Ryan

17  had to be arrested at that point, as far as you know?

18  A    I cannot speak to what the officer was thinking at that

19  time.

20  Q    He didn't call an investigation or request backup?

21  A    Not with the FBI.

22  Q    Okay, and that was about six months ago -- seven --

23  A    Yes.

24  Q    -- months ago that that occurred?

25  A    Approximately.

1    Q    I want to ask you about the -- the video that was

2    testified to previously.

3    A    Yes.

4    Q    That video was shot around -- excuse me -- was recorded

5    about -- around four months ago?

6    A    January 20th, 2017.

7    Q    Oh, I apologize.  So about two months ago?

8              THE COURT:  Did you say "2017"?

9              THE WITNESS:  January of last year, yes.

10             THE COURT:  Of last year?

11             THE WITNESS:  Or -- oh, I'm sorry.

12   BY MR. FERNANDEZ:

13   Q    Two months ago or like a year --

14   A    Two --

15   Q    -- and two months ago?

16   A    Two months ago.  Two months ago, yeah -- '18.

17             THE COURT:  2018?

18             THE WITNESS:  Yes.

19             THE COURT:  Okay.

20   BY MR. FERNANDEZ:

21   Q    And you said on that -- on that video, Mr. Ryan was not

22   seen shooting that gun?

23   A    The portions of the video that I watched of the weapon

24   firing automatic, I could not see in the frame of the video who

25   was firing.

1  Q    The affiant said he watched all five hours.  Have you

2  ever spoken to the affiant about whether he saw in any portion

3  of the video Mr. Ryan shooting the gun?

4  A    Yes.  The affiant said that they both shot the gun.

5  Q    The affiant said both shot the gun?

6  A    Yes.

7  Q    And -- but you have no reason to -- to doubt that -- that

8  he --

9  A    No, I do not.

10 Q    And the  Confidential Source Two in this case, was that

11 someone that identified himself to -- or herself to FBI or FBI

12 sought the help of that person?

13 A    This source has worked with the FBI previously.  I'm not

14 sure the initial meeting, how it went. In this case with

15 Mr. Ryan, the FBI sought his assistance.

16 Q    Okay, and as far as you know, the CS -- Confidential

17 Source Two, he has access -- or she has access to firearms?

18 A    He has access, to my understanding; however, he is under -

19 - he has some local --

20 Q    He's working off charges?

21 A    -- charges that prohibit him from possessing firearms, is

22 my understanding at the moment.

23 Q    And so if he had his own firearms, that would be something

24 he would want to hide from law enforcement?

25 A    Depending on the dates of his local charges and whatnot.

1    Q    Well, on this date, he would want to hide from local law

2    enforcement that he had firearms -- or any law enforcement that

3    he had firearms?

4    A    We had given him authorization or authority to handle

5    those firearms for the purpose of this meeting.

6    Q    But if he were to brought -- if he were to have brought

7    his own firearms to the meeting, that would have been a

8    problem?

9    A    Yes.

10   Q    And as far as you know, he says he did not bring his own

11   firearms?

12   A    Not only does he says he's not, but he was also checked by

13   the affiant that he did not have any weapons of his own on him.

14   Q    And when he was checked, he was under continuous

15   monitoring after that?

16   A    The recording -- the audio/video recording device was

17   turned on at that point.

18   Q    And so the vehicle that he was in was also checked?

19   A    Yes.  That's my understand -- that -- yes.

20   Q    Okay, and do you have any indication as to how the

21   confidential source became such a close acquaintance with

22   Mr. Ryan?

23   A    I do.

24   Q    Can you explain?

25   A    He introduced himself in November of last year -- 2017 --

 1   to Mr. Ryan at an auto garage at which Mr. Ryan worked at.

 2   Q    So Mr. Ryan was working as a mechanic?

 3   A    I'm not sure what he was doing, but that's -- I understand

 4   he has a mechanical background, so I presume he was working

 5   there as a mechanic.

 6   Q    Okay, there is one final person that was used in this

 7   investigation; that was Jason Sayas (phonetic); is that

 8   correct?

 9   A    Yes.

10   Q    And now, that person came to you, knowing that there was

11   an investigation or you approached him?

12   A    I do not know.

13   Q    Mr. Sayas never said he was a -- he was scared of

14   Mr. Ryan; is that correct?

15   A    I don't -- I don't know that either way.  I would assume

16   he was not.

17   Q    Well, it's salient is that we use his name, but all the

18   other people are confidential sources.  He never said that he

19   wanted to remain anonymous; is that right?

20   A    Correct.

21   Q    And one of his claims was that Mr. Ryan used drugs?

22   A    Yes.

23   Q    But Mr. Sayas also uses drugs; is that correct?

24   A    I do not know.

25   Q    Did he convey any stories in which they used drugs

1   together?

2   A     Yes, he did.

3   Q     So presumably he also uses drugs?

4   A     Correct.

5   Q     And Mr. Sayas said that he believed Mr. Ryan had a fully

6   automatic gun because of something that Mr. Ryan had told him?

7   A     Yes.

8   Q     Mr. Sayas said that Mr. Ryan claimed he had a gun because

9   he filed something down?

10  A     Yes.  Yes.

11  Q     He doesn't make any mention of an additional piece or a

12  clip or anything?

13  A     No, not to my knowledge.

14  Q     I just want to ask a couple more questions on the video

15  and then I'll be -- I'll finish.

16        Did the confidential source, before the video, was he

17  told his mission was to -- or his objective was to get Mr. Ryan

18  to shoot the -- shoot the gun on the video?

19  A     I -- so I was not present during the instructions for what

20  to capture, but the source knew that we were interested in the

21  weapon functioning automatically.  So I presume he was -- I

22  mean, that was the purpose of wearing an audio/video recording

23  device, was to visually capture that on the -- the device.

24  Q     And your experience with handling confidential informants

25  for this purpose, that person would have been encouraged to get

1    Mr. Ryan to commit illegal behavior on a video, right?

2    A    I don't understand what you mean by "encouraged."

3    Q    He would have encouraged him in any number of ways; with

4    words, asking him whether or not he can show him something.

5    Encourage in the normal sense.

6    A    So in the initial meeting with the source  and Mr. Ryan,

7    the source was instructed to just start a conversation and

8    start a relationship, if you will.

9         The automatic weapon piece was brought up at that time.

10   The source had no previous knowledge of it.

11   Q    And during that initial conversation and meeting, he

12   wasn't wired with audio and video, right?

13   A    Correct, he was not.

14   Q    So when he was wired with audio and video, there was a

15   more directed objective; is that fair to say?

16   A    Yes.

17   Q    And the directed objective was to get him on video

18   committing a crime, right?

19   A    Correct.

20   Q    Otherwise, you wouldn't outfit someone with that level of

21   surveillance equipment?

22   A    In this case -- I mean, that was the intent behind having

23   the audio/video recording devices was to capture the illegal

24   activity.

25   Q    And part of that is because, even though you had, I don't

1   know, eight or -- about five or six other witnesses, no one had

2   actually seen Mr. Ryan -- or no one had actually recorded or

3   captured Mr. Ryan doing anything illegal, other than, I guess,

4   meth use.

5   A    We -- the FBI had not outfitted anyone with a recording

6   device aside from this -- this one incident that we had the

7   source wired up.

8   Q    Well, and more specifically, no meth lab was found, no

9   flower bombs were corroborated, and no one could say that he --

10  they had seen him shoot a fully automatic weapon?

11          **MR. KRAEHE:**  Your Honor, I'm -- object to that

12  question.  It's -- it's -- first of all, it's a number of

13  different questions --

14          **THE COURT:**  Yeah, it is  compound.

15          **MR. KRAEHE:**  -- that completely mischaracterizes the

16  witness' testimony.

17          **THE COURT:**  Break it down.

18  **BY MR. FERNANDEZ:**

19  Q    Okay, prior to that video, no one saw Mr. Ryan shoot --

20  none of your witnesses saw Mr. Ryan shoot a fully automatic?

21          **MR. KRAEHE:**  Your Honor, I'm going to object to the

22  question on grounds that -- "no one"?  Anyone in the whole

23  world?

24          **MR. FERNANDEZ:**  No, no.  His witnesses.

25          **MR. KRAEHE:**  It's vague and ambiguous and it also

1  mischaracterizes the witness' testimony.

2          Speculative --

3          **THE COURT:**  I'm going to sustain that objection.

4          Rephrase.

5  **BY MR. FERNANDEZ:**

6  Q    Okay,  well, you could tell me, how many witnesses did you

7  use in this investigation?

8  A    I would have --

9  Q    Not -- not FBI agents or other agents; just witnesses that

10 are referred to in this --

11         **MR. KRAEHE:**  Your Honor, I'm going to object to the

12 relevant -- how many witnesses were used in the investigation.

13         **THE COURT:**  Yeah.  I'm going to sustain that one too.

14         **MR. FERNANDEZ:**  Okay.

15 **BY MR. FERNANDEZ:**

16 Q    Of the people who are involved in this investigation that

17 you spoke with or that you have knowledge of, none of them saw

18 Mr. Wheeler -- sorry -- saw Mr. Ryan shoot an automatic weapon?

19         **MR. KRAEHE:**  Objection, again, your Honor.  This

20 ground has been covered quite thoroughly already and --

21         **THE COURT:**  Overruled.

22         **THE WITNESS:**  Of the witnesses listed in the

23 affidavit, I'm not -- none of the witnesses have said that they

24 observed him aside from -- observed him firing, aside from

25 Source Number Two.

1  **BY MR. FERNANDEZ:**

2  Q    And that was -- that would be the time that was on that

3  video?

4  A    Correct.

5           **MR. FERNANDEZ:**  No other questions.

6           **THE COURT:**  All right.

7           Any redirect?

8           **MR. KRAEHE:**  I have no redirect, your Honor.

9           **THE COURT:**  All right.  Any other evidence?

10          **MR. KRAEHE:**  That's -- that's it, your Honor.

11          **THE COURT:**  Okay, Mr. Fernandez, any -- anything?

12          **MR. FERNANDEZ:**  I would argue, your Honor -- well,

13  first, I don't need --- if the witness --

14          **THE COURT:**  You can step down, sir.

15     **(Witness steps down)**

16          **MR. FERNANDEZ:**  I would argue two things, your Honor.

17          Despite the plethora of witnesses,  there's a number

18  of allegations that are pure speculation; things like, he was

19  conducting a meth lab, that certainly, he was up to no good

20  because he claimed to be flying low among homes, dropping

21  flower bombs, all these pretty outrageous claims that are

22  thrown in, I think, to cast a specter of Mr. Ryan as being

23  dangerous or otherwise a problematic person.

24          **THE COURT:**  Well, wouldn't that go towards the

25  detention hearing aspect rather than the probable cause?

1          **MR. FERNANDEZ:**  Well, and this is why I was asking

2     about to what extent was the CS Two motivated to get Mr. Ryan

3     on camera committing a crime.

4          And the reason I think that undermines probable

5     cause, your Honor, is because we have someone who, clearly, the

6     community doesn't like.  Clearly, the community has all sorts

7     of tales about who Mr. Ryan is and what he's capable of.

8          It seems, perhaps, some of it because Mr. Ryan likes

9     to claim things that he probably can't do or probably has never

10    done.  But for whatever reason, Mr. Ryan -- probably most

11    concretely we know is -- may have a problem with drug use and

12    has an affinity for guns.

13         The affidavit also says that Sayas, the one -- well,

14    there's a couple identified witnesses -- but the one identified

15    civilian  witness said that Mr. Ryan said he liked to collect

16    guns, and he bought them himself, and he built his collection

17    over time.

18         So now we have someone who -- there are all these

19    tall tales about -- in the community, who, when FBI comes into

20    the community and asks, "Is there anyone you want to bring to

21    our attention?" people say, "Mr. Ryan."

22         So we know that he is a disfavored member in the

23    community.

24         But then the question is, do they have any evidence

25    against him, other than the speculation, the reputation that he

1    probably helps make himself by making claims that are just not

2    true.

3            And we don't see anything.  The only thing that's

4    before your Honor as actual evidence of wrong doing of the sort

5    that's alleged, of having an automatic weapon, is the video.

6            Now, this officer said that he did not see any

7    portion of the video in which Mr. Ryan was shooting -- shooting

8    the gun.

9            He says the affiant, who saw the full five hours, did

10   tell him that he saw Mr. Ryan shooting the gun.  Of course,

11   that's going to be told by the video itself.

12           But at this stage, it's at least troubling that the

13   one witness that we had before the Court could not say that

14   Mr. Ryan was on the -- on the video shooting the gun.

15           At best we have two levels of hearsay that Mr. Ryan

16   was seen shooting the gun.

17           But what we also have is a concerted effort among

18   various people in the community and law enforcement to put Ryan

19   on video committing a crime.

20           That, to me, is about as close to entrapment as we

21   can see at a preliminary hearing.  Of course more information

22   is going to come out.

23           But that -- despite years' long investigation in

24   multiple different jurisdictions -- we have BLM, we have Game

25   and Wildlife, we have local enforcement, and now we have the

1   FBI all looking into Ryan.  Clearly, they don't like him.  But

2   that could happen for any number of reasons.

3            And the reason why we want judicial process to vet

4   these things is because someone's reputation, someone's

5   disfavored standing in the community is not criminal.

6            And now the only thing we have against him that's

7   actually criminal is this video that we know was set up with

8   the purpose of finding some evidence against Mr. Ryan to

9   essentially get him on tape doing something illegal.

10           Because as he admitted, no other witness had said

11  they had seen -- seen him shooting a -- shooting a gun.

12           We also have at least two different accounts of how

13  Mr. Ryan allegedly made the -- made the gun automatic.  Sayas,

14  again, who's the civilian witness who claims he knows Mr. Ryan,

15  that Mr. Ryan makes automatic weapons said he had to file this

16  thing down, he had to -- well, the actual words were, "filing

17  something and then switching it to be fully automatic."

18           That's at odds with what was explained by the

19  officer -- or the agent that is required to make something

20  automatic.  In other areas, there's a clip or a metal piece

21  described as in the shape of a square root sign -- or a root

22  sign.

23           Whether Mr. Ryan actually knew how to make a weapon

24  automatic or not is yet to be seen.  There is something that

25  they're saying as being shot in automatic mode.

1          Again, the testimony we  have was that it was the

2    confidential informant that was shooting it, not Mr. Ryan.  So

3    who, in fact, had the knowledge and the ability to make it

4    automatic is something of further inquiry.

5          At this stage, your Honor, I don't think that the

6    Government has enough.  They only show that when they try to

7    get someone on tape committing a crime, they can do that.

8          Thank you, your Honor.

9          **THE COURT:**  Mr. Kraehe?

10          **MR. KRAEHE:**  Your Honor, the witness testified that

11    he heard and saw enough of the video to determine that Mr. Ryan

12    is the person who was in possession of the firearm, he's the

13    one who converted it to fully automatic mode, he's the one who

14    placed the silencers on the firearm, he's the one who shot the

15    firearm and fired it in fully automatic mode, and he's the one

16    who fired it using the silencers.

17          Later when they conducted a search at Mr. Ryan's

18    residence, they found firearms and silencers that were

19    consistent with what was on the video.  And it was also

20    consistent with a lot of reports they had received from other

21    people to the effect that Mr. Ryan had these items and used

22    these items and a number of other items.

23          So that is far more than what's necessary, your

24    Honor, to sustain these charges at this time.

25          //

1          **THE COURT:**  I believe most of your arguments are

2    better addressed to the later stage.

3          But with regard to probable cause, I do find probable

4    cause to believe that Mr. Ryan committed the offenses (audio

5    glitch) and he will be bound over for trial on those charges.

6          With regard to detention?

7          **MR. FERNANDEZ:**  Your Honor, I would ask that Mr. Ryan

8    has conditions of release fashioned for him.

9          **THE COURT:**  I have -- I have some questions for you.

10   That you have this --

11         **MR. FERNANDEZ:**  For me or Mr. Ryan?

12         **THE COURT:**  Yeah.  This -- this -- you both have

13   the --

14         **MR. FERNANDEZ:**  I have the bail report.

15         **THE COURT:**  -- Child Services report?

16         **MR. KRAEHE:**  Yes, your Honor.

17         **THE COURT:**  Okay, on page 1, the paragraph -- "He

18   shares join custody with his six-year-old son" -- I'm not sure

19   where the son came about because all of a sudden, he has a 16-

20   year-old son with -- with a woman named Janet Kingsley,

21   but where did --

22         **MR. FERNANDEZ:**  There may have been a typo.  Let me -

23   - can I clarify?

24         **THE COURT:**  Sure.

25      **(Attorney conferring with Defendant)**

1          **MR. FERNANDEZ:** There is only one child, your Honor,

2  who is not of majority, and he's 16.

3          **THE COURT:** Okay, and it -- and that's the 16-year-

4  old that he shares joint custody?

5          **THE DEFENDANT:** Yes.

6          **THE COURT:** Okay, on the second page, he reported

7  that he is a contract worker for Peterson Machinery based out

8  of Casa Grande.

9          I notice that it indicates down later that there was

10 a lack of verifiable employment, so I want to --

11         **THE DEFENDANT:** Well, you can call them if you'd

12 like. I got their number.

13         **THE COURT:** Well, I wanted to ask Pretrial Services

14 why they decided it was unverified.

15         But also, it says that the Defendant reported he is

16 employed with Department of Homeland Security.

17         **MR. FERNANDEZ:** Yes, your Honor. I'd -- I would

18 perhaps ask to approach on that -- as opposed to speaking out.

19         **THE COURT:** All right.

20         Please approach.

21      **(Sealed Bench Conference OMITTED from 11:11 a.m. to**

22 **11:15 a.m.)**

23         **THE COURT:** So let me ask Pretrial Services, what

24 attempts were made to verify employment with Peterson

25 Machinery?

1          **PRETRIAL SERVICES OFFICER AVILA-TOLEDO:**  I just

2   talked with the (indiscernible), your Honor.  They go visit

3   (indiscernible).

4          **THE COURT:**  Okay, so there -- there may be a phone

5   number?  But did Mr. Ryan provide a phone number?

6          **PRETRIAL SERVICES OFFICER  AVILA-TOLEDO:**  Not to

7   (indiscernible).

8          **THE COURT:**  Okay, all right.

9          Go on ahead, Mr. Fernandez.

10         **MR. FERNANDEZ:**  Your Honor, I forgot where we were,

11  because I know your Honor asked some questions.

12         **THE COURT:**  Oh, yeah.  Those were my -- those were

13  the questions I wanted to ask.

14         **MR. FERNANDEZ:**  Okay.  Your Honor, I would further

15  point out that Mr. Ryan has documented residence.  He is always

16  available.  Law enforcement knows very well where he is and all

17  of his -- all of his various assets.  They knew at least --

18         **THE COURT:**  Well, he declined -- he declined to

19  discuss his  assets and liabilities.  And you know, that as a

20  part of my calculation, generally, in being able to set --

21  assess flight risk.

22         Also he had two -- they found two airplanes at the

23  location.

24         **MR. FERNANDEZ:**  Yes, your Honor.  And that's part of

25  what I mean.  Those are all known to law enforcement.  When

1   they went to search what they believe to be Mr. Ryan's

2   property, they knew of at least three different places to go.

3          There's nothing that Ryan -- Mr. Ryan seems to be

4   hiding from law enforcement.  They've been watching him and

5   investigating him for well over a year.  They have had ample

6   opportunity to see if Mr. Ryan is committing any other criminal

7   acts and (audio glitch) alleges that he manipulated a gun, an

8   otherwise legal gun, to  fire more rapidly.

9          So Mr. Ryan stands before you with a single

10  misdemeanor conviction and about the closest possible scrutiny

11  of law enforcement, several different agencies, for an extended

12  period of time, and the only thing that is before your Honor is

13  that he has an otherwise legal gun that is manipulated to shoot

14  more than one round at a trigger pull.

15         Which I don't use guns.  I am actually often

16  surprised by New Mexico's liberal gun laws, but that doesn't

17  seem to be a far departure from what is perfectly legal, that

18  he can shoot more than one round with a single trigger pull

19  rather than multiple rounds that are otherwise unrestricted.

20         I understand one is a criminal act and the other

21  isn't.

22         **THE COURT:**  Uh-huh.

23         **MR. FERNANDEZ:**  But if that's the only thing that's

24  alleged after a year of following Mr. Ryan, he is not such a

25  danger in the community that he can't be told, specifically,

1  obviously, that he can't conduct any criminal behavior, but

2  otherwise can be let in the community while these charges are

3  being  prosecuted.

4          **THE COURT:**  Mr. Kraehe?

5          **MR. KRAEHE:**  Your Honor, we believe that the

6  Defendant is a flight risk and a danger to the community, and

7  that no combination of conditions can ensure the safety of the

8  community and his continued appearance here in court.

9          First as to the weight of the evidence, your Honor,

10 the crime is on videotape.  There is absolutely no doubt that

11 it is Mr. Ryan on that videotape firing an illegal firearm, in

12 possession of it.

13         He explains in detail exactly what he is doing as he

14 is doing it.  And he states as he is doing it that it is a

15 crime to do so.

16         So that part of it is a foregone conclusion, your

17 Honor, as far as we're concerned.

18         As to the danger to the community, your Honor, we

19 would show the Court that Mr. Ryan has made threats, and this

20 is stated in the affidavit.

21         And if there is any need for us to have a witness on

22 these points, he threatened at one point his -- or he stated

23 his desire to kill President Obama.  He has a history of flying

24 in his airplane -- which incidentally is unregistered.  He has

25 no license to fly an airplane.

1        He has not maintained a physical that is required to

2   fly an airplane.  He flies over Air Force troop operations, he

3   buzzes them.  This has been reported by Air Force personnel.

4   He has dropped flower bombs on them.  That has been reported by

5   Air Force personnel or other witnesses.

6        And he has a history of interactions with other law

7   enforcement agencies that indicates that he is a threat.

8        I think, clearly, the biggest threat is the fact that

9   he has, what we -- I think it was -- the count was eight

10  firearms at his residence.  We found hundreds of rounds of

11  ammunition, possibly over a thousand rounds of ammunition.

12       And the statements that have been attributed to

13  Mr. Ryan regarding arming his airplanes with firearms are a

14  particular concern.

15       So I think under the totality of the circumstances,

16  your Honor, and given all these different facts that have

17  arisen in the course of the investigation -- you know, we have

18  a picture of an individual who is, quite frankly, obsessed with

19  firearms and ammunition and has engaged in conduct of a

20  dangerous nature directed towards the Government.

21       That's why he was the target of this investigation.

22  And certainly there are a lot of facts that bare all of this

23  out.

24       As to the flight risk, your Honor, this operation

25  that resulted in his arrest came about very quickly and

1   suddenly because of information that we had received that

2   Mr. Ryan was planning to leave the country back then.

3           Perhaps he had been tipped off as to the

4   investigation.  And then he -- we had to move very quickly

5   because we had information that he was going to leave the

6   country.

7           That's a particular concern.  Especially coupled with

8   the fact that he has the means to do so with an unlicensed,

9   unregistered airplane, which he boasts about flying under the

10  radar, in which we have information that he has, in fact, flown

11  in very low altitudes that would make his evasion much easier.

12          In addition, he lives in a very rural area on, I

13  believe it's around 20 acres.  There are different structures

14  on this property.

15          It would be very difficult for law enforcement to

16  monitor Mr. Ryan to determine whether or not he is, in fact,

17  planning to carry out his stated intention of leaving the

18  country.  And that's of particular concern.

19          So, your Honor, we would ask that you adopt Pretrial

20  Services' recommendation and detain Mr. Ryan.

21          **MR. FERNANDEZ:**  Your Honor, may I respond briefly?

22          **THE COURT:**  Go ahead.

23          **MR. FERNANDEZ:**  There are a number of things that

24  are -- that sound like statements being attributed to Mr. Ryan

25  with no witnesses, no  actual source being identified.

1        Talking about the flower bombs again, saying that he

2   was flying low.  These are all things that were either -- that

3   are being attributed to Mr. Ryan with no  opportunity to

4   confront their veracity.

5        Mr. Ryan, according to the complaint, does appear to

6   engage in some idle chatter where he claims he's doing things

7   that probably never happened.

8        In addition --

9        **THE DEFENDANT:**  I can explain why --

10       **MR. FERNANDEZ:**  No.  Huh-uh.

11       In addition, the -- I'm sorry, I lost my train of

12  thought, your Honor.

13       **THE COURT:**  Take your time.  There's no rush.

14       **MR. FERNANDEZ:**  In addition, your Honor, the

15  Government said that they had to rush their investigation.  But

16  that's  contradicted by the complaint here, that the best piece

17  of evidence that the Prosecutor is pointing to -- well, they're

18  characterizing as the best piece of evidence.

19       The video was obtained months ago.  So the idea that

20  they had to somehow rush this operation because of claims that

21  he was going to leave -- and they're saying "credible claims"

22  that he's going to leave the country is not substantiated by

23  what we have before the Court.

24       **MR. KRAEHE:**  And, your Honor, if I may add a couple

25  of facts that I forgot to mention and was just brought to my

1  attention.

2          I do want to mention that, at the time of his arrest,

3  Mr. Ryan (audio glitch) indicates some plan or intention to

4  evade arrest or detention.

5          THE DEFENDANT:  Well, I -- I can --

6          THE COURT:  And just for the record, it was hard to

7  hear.

8          He had a hand -- handcuff key in his mouth at the

9  time of arrest?

10          MR. FERNANDEZ:  Yeah, that's correct, your Honor.

11          THE DEFENDANT:  I -- I can explain that.

12          MR. FERNANDEZ:  And -- and, your Honor, it was also

13  brought to my attention by Pretrial Services that they did

14  reach out to the stated employer -- I think it was Peterson

15  Mechanical.

16          THE DEFENDANT:  Peterson Machinery Sales.

17          MR. FERNANDEZ:  Machinery or -- and that, in fact, he

18  has not been employed there for the last seven years.

19          THE DEFENDANT:  I am -- you need to call them.  I'm

20  hired.  I'm going to do a job in Chandler, Arizona.  I have a

21  job there, ma'am.  I got proof of it.  I'm sorry.

22          THE COURT:  What  I have to do is go on the

23  information that I have available to me today.

24          THE DEFENDANT:  Well, they should have called them

25  up.  And their phone number there is 502-836-9727 or 949 -- I

1    forget.  It's on my phone.  I got the phone number because I am

2    employed there.

3              THE COURT:  Well, the information we have is that you

4    haven't been employed with them for seven years.

5              THE DEFENDANT:  I worked for them last year when I

6    was in L.A.  And even  Ryan said  he talked to --

7              THE COURT:  Well, we're -- I have to go on the

8    information I now have available to me, Mr. Ryan.

9              THE DEFENDANT:  What about the work I've done for the

10   FBI?

11             THE COURT:  And what I'm going to do is -- at this

12   time, I do believe that the Government has demonstrated to me -

13   - this is not a presumption case based upon the charges, is it?

14             MR. KRAEHE:  That's correct, your Honor.

15             THE COURT:  Nevertheless, I find that by clear and

16   convincing evidence, the Government has shown me that Mr. Ryan

17   is a danger to the community and also by a preponderance of the

18   evidence that no condition or combination of conditions for

19   release will reasonably assure his appearance as required at

20   future proceedings.

21             Among the reasons I'm making  this finding is the

22   weight of the evidence against the Defendant, given the

23   testimony with regard to the video that a source was searched

24   and didn't have any weapons at the time that he met with

25   Mr. Ryan.

1           And so Mr. Ryan would have presented those -- that

2    weapon and also their comments on the automatic nature that you

3    could hear it.  The silencers,  it's unregistered --

4           **THE DEFENDANT:**  Ma'am --

5           **THE COURT:**  -- the weight of evidence is strong.

6    Also a history of violence or use of weapons.  I note, too,

7    that I believe you've indicated that there was methamphetamine

8    located in his vehicle at the time of arrest.  Methamphetamine,

9    which is indicative of an issue with regard to substance abuse.

10          I also have all the comments or the testimony that

11   was set forth in the affidavit with regard to substance abuse.

12          I'm still concerned about the allegations of

13   encounters with law enforcement and alleged threats that he's

14   made.  The fact of the two airplanes and allegations that he

15   would fly those  and which he would not be detected, that he's

16   not registered or have a license to fly those --

17          **THE DEFENDANT:**  The only one that's flying, your

18   Honor, is an ultralight.

19          **THE COURT:**  And also -- I'm going to ask you to

20   listen to your attorney.  There's a reason you have him, okay?

21          And I just can't see any reason why anyone would have

22   a handcuff key in their mouth.

23          **THE DEFENDANT:**  I can --

24          **THE COURT:**  And that is a risk of flight.

25          **THE DEFENDANT:**  I can explain that, ma'am.

1        **THE COURT:**  And so for all of those reasons, I'm

2   going to have him remain in custody until the time of his

3   trial.

4        Anything else, Mr. Fernandez?

5        **MR. FERNANDEZ:**  Nothing further at this time, your

6   Honor.  Thank you.

7        **THE COURT:**  Any other findings you need me to make,

8   Mr. Kraehe?

9        **MR. KRAEHE:**  Nothing further from the United States,

10  your Honor.

11       **THE COURT:**  All right.  Thank you very much.

12       **(Proceedings adjourned at 11:29 a.m.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

# CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **September 5, 2018**

            Signed                                          Dated


                    *TONI HUDSON, TRANSCRIBER*